MAG INSTRUMENT, Inc. v. COLEMAN CO, DOE'S, 1-10, 2010-12-79 Mr. Weiss, when you're ready. May it please the court, I represent MAG Instrument, a flashlight manufacturer. With regard to anticipation, the district court based its conclusions that claims 1 and 2 were anticipated solely on the Petzl Micro and Petzl Duo headlamps. Let me ask you about the Stretton British patent. Why isn't it very clear that everything in claim 2 is in Stretton? First of all, Stretton does not have serrations, your honor. It has a retractable pin. It has a ratchet and pawl device. Isn't that equivalent to serrations and stops? No, it's not, your honor. That's one that is a locking mechanism. And Professor Siegel in his declaration explained that very clearly. In fact, Stretton talks in terms of locking, your honor. What about Chen, in terms of obviousness? Well, Chen... There's very little difference except where the battery is, but that seems... No, that's not the only difference, your honor, at all. In Chen, the serrations or grooves in Chen were on the base and not on the lamp body. Aren't these pretty minor differences? We're talking about obviousness. These aren't major changes to make a really new invention. Well, you could make that same argument with regard to any combination of mechanical elements, but Professor Siegel, your honor, explained why, if you look at Chen, it teaches against relocating the serrations from the base to the body. If you orient the lamp body in a certain way, that will expose the opening in Chen, your honor. You wanted to tell us about Petzl, the on-sale issue? Yes, your honor. As I was saying, contrary to the assertion by Coleman in its brief, the district court did not conclude that Claim 2 was anticipated by other references. This attempt by Coleman to bootstrap other prior art into its anticipation argument simply underscores the weakness of Coleman's defense based on Petzl. Coleman's anticipation defense relating to the Petzl headlamps is based on the names of the Petzl headlamps and not the design or structure of the Petzl headlamps that existed prior to the critical date. And the same name does not mean the same design. The auto industry certainly teaches us this. A 1967 Ford Thunderbird is much different in design than the later versions of the car with the same name. Coleman here is trying to prove its anticipation defense based on the fact that the earlier Petzl products have the same names as the present-day headlamps, which its engineer, Kevin Tarter, then compares to Claims 1 and 2 of the 272 patent. But Coleman fails to prove that the designs of the earlier Petzl Micro and Petzl Duo headlamps are the same as the product sold today. And the district court never actually found a Petzl headlamp with a beam adjustment mechanism was on sale prior to the critical date. Mr. Petzl, without establishing his relationship with Petzl International or Petzl American, states in his declaration that the technical drawings attached to his declaration are accurate depictions of the Petzl Micro and Petzl Duo sold by Petzl America prior to the critical date. But Mr. Petzl never explains what the drawings show nor states whether these Petzl lamps had an adjustment mechanism prior to the critical date. No comparison is made by Mr. Petzl between the Petzl lamps sold prior to the critical date and the current models of the Petzl Micro and Petzl Duo, which are the subject of Mr. Tarter's declaration. And there is evidence, including Mr. Petzl's own patents, that the Petzl Micro and the Petzl Duo are still sold today. The Petzl 834 patent relating to the Petzl Micro headlamp teaches that the bulb is to be made in a fixed vertical position and that the casing holding the batteries is only to be pivoted to replace the batteries. Mr. Weiss, you've asked that if we send this back, we instruct that it be assigned to a different drug. And it's hard to escape the feeling that there's a kind of piling on inherent in that request based on other cases. What reason is there for us to believe that this case, if it were remanded, wouldn't be dealt with fairly and objectively? I think for the same reasons that this court sent the Trimed back to another judge and for the same reason that other courts have done the same thing, Your Honor. Here in this case, he did exactly what he did in Trimed. He adopted the findings and conclusions of Coleman without any change. He completely ignored Professor Siegel's declaration. He clearly substituted efficiency over justice. He clearly— You mean you lost? Well, we lost, Your Honor, but we think we never got a fair hearing in that case. In fact, there wasn't much of a hearing at all. You asked for this judge, right? I mean, there was a transfer initially. No, we never asked for this judge, Your Honor. You asked for a transfer? What happened there? No, Your Honor. What we did is we had to file with the district court in the Central District of New York to get a statement of related cases. There had been a previous related case, I take it, before Judge Reel? Actually, there was never a real relationship between any case that Judge Reel had and this case. I'm not sure how you can explain how it ultimately ended up with Judge Reel, but the only reason that it got transferred from the original judge was because we had to file a related case document. Certainly, we didn't have any choice in the matter. Who was the other case originally assigned to? Your Honor, I must say . . . Somebody else. It was somebody else. Somebody else. Can I take you back about five minutes to Judge Lurie's first question, which is on the patent? Yes. Your answer seemed to be that it didn't have any serrations, but looking through the appendix, it seems clear that Stretton has been consistently described as having serrations, right? Not by us, Your Honor. Your view is, how is what appears in Stretton different than . . . Why is it not a strut? Well, I think if you just went to the dictionary and looked up the word serration, you would see that it's not intended to be a series of holes in which you retract or push a pin into, Your Honor. One is indeed a locking mechanism, whereas the other is not. In fact, the Hallis patent teaches that the stop there accommodates a movement of the lamp. Well, it accommodates . . . provides that with a protuberance and an angular edge to engage grooves. These are all similar devices, similar mechanisms of a fairly simple nature. Your Honor, hairpin is simple, too, but here what you have is you have no suggestion in any of these prior art patents to modify them in order to come up with the claimed combination of either claim one or claim two. So, there's no reason to make these changes to come up with this combination. You're into your rebuttal time. You can use it or save it as you wish. Well, I'll save it, Your Honor. Thank you. Mr. Roddick. May it please the Court. Jonathan Roddick for the Coleman Company. Good morning. Mr. Hallas did not invent serrations and stops, nor did he invent their use for adjusting the angle of a portable light. He did not invent placing the battery together with the light source in the body of an angularly adjustable light as required by claim one, and nor did he invent having the battery somewhere else as claimed to allow. But he says the combination was unique. The combination, Your Honor, is an arrangement. He says all mechanical inventions are made of old parts. That's true, but this Court's precedents and the Supreme Court's precedents provide a test for that, and that is that where a patent simply arranges prior art elements according to their established functions with no unexpected result, the combination is obvious. And that's precisely the case here, because that's what claims one and two do. Mag's attack on that finding relies, and is premised on, two legal errors. The first is that in order to distinguish the prior art that was before the Court and before this Court, they add into the claims limitations and engineering details that simply aren't there. This Court had a very similar case last year, the George M. Martin case, in which there was a prior art bundle breaker, which had a compliance structure at the bottom. The patent in that case switched the location of that compliance structure from the bottom to the top. The Court said that a simple switch of prior art elements is obvious. The patentee said, wait, it's not that simple. There are, in fact, engineering details that make it that you can't just switch something from the bottom to the top. And this Court held that that was irrelevant because those engineering details and those distinctions were not found in the claims. Likewise here, Mag relies entirely on distinctions that are not in the claims. What about Petzl? Aren't there genuine issues of material fact? No, there are not, Your Honor. The District Court found correctly that the Petzl Micro and Duo headlamps sold in the United States prior to 1999 had every limitation of claims one and two. Now, Mag says, well, isn't it possible that there were versions of those lamps that were earlier that didn't use serrations and stops? That's just speculation that's not sufficient to defeat summary judgment. If such versions of the Petzl Micro and Duo simply don't exist, if they existed, Mag would have found them, or you would expect Mag would at least have looked for them. They made no effort to do so in this case. Didn't even make a 56-F request at summary judgment to go and find them because they knew what- Well, we're dealing with a summary judgment of invalidity. Obviousness and anticipation is fairly strong. We say there are no issues of fact relating to obviousness. It's one thing with references. We can read references. If you were talking about testimony about a sale and about what the sale involved- And so this is limited to the anticipation issue, Your Honor. And the evidence that was before the court was clear and convincing on that point. We were able to obtain the declaration of Mr. Petzl, who was the president of the French company, who has a subsidiary here in the United States, who received personally patents on the Petzl Micro and Duo, who provided contemporaneous drawings linked up with 1995 catalogs of those products sold here in the United States. And the drawings provided by Mr. Petzl, which he said showed those devices as they were sold in the United States in 1995, showed the limitations that are relevant to Claims 1 and 2. Now, his declaration is the declaration at 989 to 991, correct? It's the only- That's all. That's just basically a one-page declaration, not counting the caption. It's brief, Your Honor. And it says- Well, it's not just brief, but it's terse to the point of almost unhelpful in that he doesn't spin out, as I understand this, where on, for example, on the technical declaration of the technical design sheets, you would find the elements of the pre-1995 device. Well, it's true, Your Honor, that he doesn't explain that. That would have been helpful, don't you think? It may have been, Your Honor, but I think it's not at all necessary because we can compare those drawings to the other evidence in the case, the physical lamps. And it's very important. The physical lamps that we put before the Court, even MAG doesn't dispute that they had all the elements of Claims 1 and 2. But there's no proof that those physical lamps that you put in had been sold prior to 95, right? Those particular- Those particular lamps, right. No, what we're doing, Your Honor, is comparing the features, the structures of those lamps with the structures that are in the technical drawings and in the patents. But you didn't have anybody that walked us through that. Well, we did, Your Honor, and that was the declaration of Mr. Tartar. Okay. And it's shown most clearly in our supplemental appendix of pages 1511 and 1513 that show, using the 88 and 1995 patents with the 1990-92 technical drawings, that they have the same serrations and stops for angular adjustment as required by Claims 1 and 2. All right. So you say that your- Mr. Tartar, it gives you the connection between Petzl and the drawings. Mr. Tartar does that. And I think the drawings are very clear and speak for themselves as well. And the Court can look directly at them and see- That's asking a lot. I spent some time with the drawings. And I, you know, at some level of confidence, I think I see what you're referring to. But I wouldn't, without help, I wouldn't, if I were district judge, enter summary judgment based on my reading of the drawings. Well, Mr. Tartar provided that information and I would suggest- What's the most helpful part of Mr. Tartar's declaration? Mr. Tartar simply states- Vis-a-vis the drawings and what the drawings show. That he compared the two. The technical drawings provided by Mr. Petzl with the physical samples that he held in his hands. Right. But does he show us on the drawings exactly where the various features are that are the anticipating features? On the- In his declaration. He does not do that. He does not make annotations on the Petzl technical drawings. Okay, that's what I was- He does not do that. What he does is he explains that those features found there- Okay. Are the same as in the lamps that he was physically examining. Which is something that he did and Mag's expert did not. You've got Professor Siegel's expert opinion, which seems to have been virtually ignored by Judge Reel in his summary judgment opinion, right? Well, Your Honor, this goes back to my earlier answer to the court's question, which was that the things that Professor Siegel are talking about are based on two legal errors. Then the first is that he talks a lot about limitations that are not present in the claims. He talks about things and says, well, those aren't suitable for headlamps. Well, the claims are not limited to headlamps. He talks about particular amounts of force required to adjust the angles of the lamps. Claims are silent on that. And the most important thing that you heard from Mr. Weiss earlier this morning is this pervasive argument that the prior art used locking mechanisms, whereas Halas does not. Of course, Halas is totally silent as to whether the mechanisms are locking or not. But even if they were limited to locking mechanisms, you do have prior art available in the record that does not use locking serrations and stops, as that term is used by Mag. Referring to chance. The Chen reference that they are referenced. But I think really that's going further afield than you need to go. There was not a dispute in the lower court about the meaning of serrations and stops. In fact, Mag told the court in its motion for summary judgment, these claim terms were readily understandable and provided a definition of stop to which Coleman agreed. And that's found at page 846 of the record. And the definition provided there was stop. Something that impedes, obstructs, or brings to a halt. All of the prior art that we put into the record, other than the Johnson reference, which uses a ball and socket adjustment, the small ball and socket, has a stop that meets that limitation. The other problem with Professor Siegel's declaration, another pervasive problem, was it ignored the proper target of the 103 inquiry, which is the subject matter as a whole at the time the invention was made, to a person having ordinary skill. What Professor Siegel does instead is take us on repeated excursions as to why a bicycle lamp designer in 1899 wouldn't have modified his bicycle lamp to make claims one or two. Or why a 1925 miner's lamp designer wouldn't have modified his lamp. I appreciate your analysis. I might even agree with it. I think it's persuasive. The difficulty I'm having is that I can't find where Judge Reel and his opinion ever deals with what you've dealt with. In other words, it's not apparent from the face of it that he takes what Professor Siegel said and either dismisses it or rejects it for various solid reasons that you've articulated. Isn't that a problem for you? No, I don't think so, Your Honor. Opinions of a district court on summary judgment serve to facilitate review. And here there's no hidden determination that Judge Reel made as to anything that would prevent this court from looking at the same. He doesn't discuss at all Professor Siegel's arguments and why he discounted that, why they ought to be discounted as you've suggested to us this morning, right? Well, he does explain the features of the prior art, how they relate to the claims one and two. It's true that Mag put in a very lengthy and wordy declaration by Professor Siegel. I don't think it's incumbent on the district court to, in order to grant summary judgment, to wade through all that when it's so pervasively undergirded by the legal error. And returning to the Section 103 problem, as this court put it rather memorably in the Union Carbide case, the starting point of the 103 analysis is the inventor in a shop with the prior art, which he is presumed to know, hanging on the walls. And here we start with the problem. Not the Winslow case? Which cites back to the Winslow case. We start with the problem provided by Mr. Halas in the patent itself, which is found at column one, starting at line 35. The primary function of flashlights is to provide a convenient, portable, storable light source that is capable of projecting light in a particular direction. However, it is difficult for some flashlights to project light in a particular direction because of the stationary nature and fixed connectivity of flashlight parts relative to each other. So that's the design need that Mr. Halas was addressing. And now we go back to Winslow and Union Carbide. And there he is, having articulated that design need in his shop with all the prior art that we've discussed hanging on his walls, straddling the minor side. What about reassignment to a different judge if we send it back? I don't think that would be warranted in this case, Your Honor. There is no indication that Judge Real bears any prejudice towards MAG or is unable to give them a fair shake or anything that would be analogous to two earlier cases in which that was done. Does the court have any further questions about the anticipation ruling? Vis-a-vis the Petzl lamps? I guess not. Anything further, Mr. Rotter? Your Honor, I would just conclude by urging the court that the district court correctly found that the claims one and two of Halas were obvious based on the prior art that we submitted or anticipated by the Petzl micro and duo lamps sold here in the United States as early as 1995, embodying all the elements of claims one and two and respectfully request that this court affirm. Thank you, Mr. Rotter. Mr. Weiss has a few minutes rebuttal. First of all, the original judge was Judge Percy Anderson. Okay, thank you. With regard to the question of stop, that's actually defined in the where it states that the pivot stops located on the base portion also allow for 180 degree angular adjustment of the body with respect to the base portion. So it is not a lock. It is something that allows for adjustability. With regard to the obviousness question, as the Supreme Court stated in KSR, rejections on obviousness grounds cannot be sustained on mere conclusory statements. Instead, there must be some articulated reasoning with some rationale to support the legal conclusion of obviousness. What Coleman and the district court have done is to identify a series of prior art patents, each with various elements, and then simply conclude that the claims are obvious. And even if the prior art patents had shown that all the elements claimed were independently known in the prior art, that is not enough under KSR to prove obviousness. There was no evidence submitted by Coleman, nor were there any findings by the district court why any of the prior art patents should be combined with any of the other cited prior art patents to achieve the claimed combination of elements recited in the claims. And as stated in KSR, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. And the Supreme Court said this was important because claimed discoveries will almost of necessity be combinations of what is already known. Unlike KSR, where there was a need and market pressure to convert mechanical pedals to electronic pedals, no such design need or market pressure has been shown to exist here in this case. Furthermore, the prior art suggests that there are numerous options to pursue. The first option is whether or not to make the direction of the light beam adjustable, and assuming that you want an adjustable beam, the prior art teaches numerous ways to do it, and each way has its own advantages. You could do a friction fit as taught by Johnson. This design allows for a greater range of adjustment. You can use a retractable pin or detent lock mechanism as taught by Stratton, Leung, Berman, and this will better secure the lamp in a fixed position. You could use a- But the lock also allows adjustment in the sense that you could unlock, readjust, and relock, right? That is true. So when you were saying earlier that Stratton is really distinguishable because it doesn't allow adjustment, it just, it takes more time to go through the adjustment process because you have to unlock and then relock, presumably. That's right, but it is a lock mechanism. I understand, but I just, it seemed to me a little unfair to say that that's not really adjustable. I don't think I said that it wasn't adjustable, Your Honor, and if I did, then I made a mistake because it certainly is adjustable if you retract the pin.  Okay. Mr. Weiss, your time has expired. Do you have one final thought? Yes, Your Honor. With regard to these various options, you could, in addition to these different types of locking mechanisms, other mechanical things, you could also choose to locate the various components on other parts of the lamp, such was taught by Thayer. And you could choose an adjustment mechanism with serrations and put it on the base as opposed to the lamp body. But with respect to all of these options, unlike KSR, the prior art does not suggest which options should be pursued. Thank you. I think we have that final thought and we appreciate your vote.